SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff-Appellee,

v.

Gerson BLATT, Barton S. Udell, and
John Pullman,
Defendants-Appellants.

No. 76–2181.

United States Court of Appeals,
Fifth Circuit.

Nov. 15, 1978.

Gee, Circuit Judge, filed an opinion specially concurring and dissenting in part.

E. David Rosen, Miami, Fla., for Pullman.

Burton H. Finkelstein, Washington, D. C., Robert C. Josefsberg, Miami, Fla., David J. Levenson, David M. Lewis, Washington, D. C., for Blatt et al.

Mark A. Loush, Detroit, Mich., David Ferber, Sol., Irving H. Picard, Asst. Gen. Counsel, Frederick B. Wade, Atty., Alan Rosenblat, Asst. Atty. Gen., John P. Sweeney, Atty., S. E. C., Washington, D. C., David R. King, Atty., S. E. C., Salt Lake City, Utah, for plaintiff-appellee.

Before CLARK and GEE, Circuit Judges, and LYNNE, District Judge.[*]

LYNNE, District Judge:

This appeal is from a final judgment entered by the District Court for the Southern District of Florida permanently enjoining appellants Gerson Blatt, Barton Udell and John Pullman from engaging in further conduct that would violate Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. The judgment further ordered Pullman to disgorge the sum of $315,377.50, representing the profits that he had realized through violation of the Act, and taxed the costs of such disgorgement against Pullman and Blatt.

This action centers around two acquisitions of Corporation of the Americas Limited (COAL) stock by Exquisite Form Industries, Inc. (Exquisite). Appellant Blatt, principal counsel to COAL, was the predominant figure in both transactions.

1. *The Pullman Sale*

In 1967, COAL was a small Florida real estate company. Use of a paradoxical accounting system made COAL an attractive target for acquisition: COAL's financial statement reflected large profits while its tax returns showed substantial losses.[1]

In December, 1967, Exquisite acquired approximately 92% of COAL's outstanding stock. At the time of the acquisition Exquisite's accountants concluded that 92% ownership was sufficient to permit it to "pool" its assets with COAL's. Exquisite was anxious to accomplish "pooling of interests" because of COAL's much greater profitability, as reflected on its financial statement.

In February, 1968, Blatt solicited Richard Sadowski, who was formerly president of COAL, to secure the purchase of various blocks of COAL shares which he had previously sold or given away. Through various misrepresentations, Sadowski induced sixteen shareholders to sell 47,730 COAL shares. Blatt arranged for the purchase of these shares for $59,662 by a Lichtenstein trust known as Delami. Pullman, Blatt's long-time client, controlled Delami and was its beneficiary.[2]

Exquisite's accountants determined that in order to give a "pooling-of-interests" accounting and tax treatment to the COAL acquisition in Exquisite's financial statements, it would be desirable for Exquisite to own 95% of the outstanding shares of COAL, instead of 92%. In July and Au-

---

[*] Senior District Judge of the Northern District of Alabama, sitting by designation.

1. COAL's primary business was telephone sales of installment land purchase contracts. Its costs far exceeded down payments received from buyers. However, on its financial statements COAL listed as income the total contract price for the land parcel, even though as little as two per cent actually had been received. In contrast, for tax purposes, COAL reported only actual income, while deducting its substantial expenses.

2. Pullman and his wife were sole beneficiaries of the trust.

gust, 1968, Blatt negotiated the sale of Pullman's COAL stock to Exquisite at a price of $375,000, a profit to Pullman of approximately $315,000 on his six month investment.

The trial court held that Blatt and Pullman violated Section 10(b) and Rule 10b–5 by their failure to disclose material facts to the sixteen shareholders who sold their stock to Pullman in February, 1968. The court found as a fact that Blatt and Pullman knew at that time that Exquisite would need the additional COAL shares for the purpose of "pooling" and held that nondisclosure was a material omission.[3]

### 2. *The Naitove Trust*

For over two years after the 92% Exquisite acquisition the law firm of Blatt and Udell was counsel to COAL. Prior to June 9, 1969, Blatt and Udell were informed that Exquisite proposed a merger by which Exquisite would acquire 100% of COAL's outstanding shares. The merger was approved at a meeting of COAL shareholders on June 30, 1969, upon the strong recommendation of COAL's management.

The Blatt and Udell law firm assisted in the formalities of the merger, including the incorporation of the surviving company and necessary filings with the Florida Secretary of State. Udell signed the merger certificate as secretary of the new company.

Until May 6, 1969, Blatt held 13,700 shares of COAL as trustee. Beneficial owners of the shares included Blatt himself, who owned 4,067 shares, and Udell, his law partner, who owned 2,033 shares. On May 6, 1969, Blatt transferred legal title to the 13,700 shares to Willard Naitove, as trustee. Blatt's explanation for the change of trustee was that he intended to object to the

merger and he did not wish to embarrass Exquisite by having the objection entered in the name of COAL's counsel.

On June 26, 1969, Naitove, as trustee, filed a timely objection to the merger pursuant to the Florida dissenters' rights statute. Shareholders who did not object to the merger received one share of Exquisite stock for every three shares of COAL stock they owned. Eventually, Blatt negotiated a settlement of the Naitove trust objection by which the trust received one share of Exquisite stock for one share of COAL stock.[4]

The trial court found that Blatt and Udell did not disclose their beneficial ownership of COAL shares held in the Naitove trust to Exquisite. The court held that such omission was of a material fact, and, therefore, that Blatt and Udell violated Section 10(b) and Rule 10b–5.

This appeal presents many issues, as appellants have attacked the trial court's findings of fact, conclusions of law and remedies. We affirm in part and vacate and reverse in part.

■ Turning first to the trial court's findings of fact, we reject appellants' challenges. Our review is limited by the rule that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.R.Civ.P. 52(a). *Wolf v. Frank*, 477 F.2d 467 (5th Cir.), *cert. denied*, 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973). The Commission is entitled to the benefit of all reasonable inferences and to have the evidence viewed in the light most favorable to it. *SEC v. Parklane Hosiery*, 558 F.2d 1083 (3d Cir. 1977).[5]

---

**3.** The trial court did not hold Blatt and Pullman liable for misstatements of fact made by Sadowski. Sadowski, having entered into a consent agreement with the Commission prior to trial, is not a party to this appeal.

**4.** Exquisite failed to honor an agreement with the objecting shareholders to register their Exquisite stock. As a result the objecting shareholders in a subsequent settlement ultimately received less for their COAL stock than non-

objecting shareholders. Under the original settlement the objectors expected to receive Exquisite stock of almost twice the equivalent value received by non-objectors.

**5.** *Accord: Crews v. Cloncs*, 432 F.2d 1259 (7th Cir. 1970); *Stacher v. United States*, 258 F.2d 112, 116 (9th Cir.), *cert. denied* 358 U.S. 907, 79 S.Ct. 232, 3 L.Ed.2d 228 (1958).

The first finding challenged concerns Blatt's and Pullman's knowledge in February, 1968, when Pullman purchased 47,730 COAL shares. The trial court found that they knew at that time that it would be desirable for Exquisite to acquire additional COAL shares for "pooling" purposes.

Evidence in the record supports the trial court's inference that Blatt had access to and used this inside information. Exquisite's chief financial officer, Robert H. Solof, testified that at the time of the 92% acquisition of COAL, Exquisite's accountants would have preferred a 95% acquisition. Blatt was intimately involved in the negotiations between Exquisite and insider shareholders of COAL that culminated in the 92% acquisition on January 5, 1968. During the negotiations Exquisite's accountants used Blatt's law library and explained the "pooling" concept to him.

Certainly, the court could infer from these facts along with Blatt's subsequent actions that he learned of the Exquisite accountants' uneasiness about "pooling" with 92% or less. In late 1967 Blatt approached Richard Sadowski, stating that his client needed a minimum of 50,000 shares to consummate a transaction with Exquisite. Contrary to Pullman's explanation that he simply felt that COAL was a good investment due to his confidence in COAL's president, Blatt's statement to Sadowski clearly indicates that Blatt had in mind a sale to Exquisite from the outset.

Blatt offered the shares in a letter to Exquisite on July 5, 1968. The letter stated in part that

> During our negotiations at the end of last year, I recall several discussions with your staff regarding the advantages of acquiring sufficient stock in C.O.A.L. to permit a "pooling" and I believe the acquisition of these shares would enable the company to do so.

Blatt admits that he knew that Exquisite needed to acquire more stock for "pooling," but claims that he was informed in June of a new rule of the American Institute of Certified Public Accountants requiring a 95% minimum. Significantly, Blatt offered no evidence of the existence of such a rule. Also, Blatt's letter to Exquisite made no mention of any new rule; instead, it implies that Blatt acquired his knowledge of pooling in late 1967.

Likewise, the court could infer that Blatt relayed his knowledge about pooling to Pullman. Pullman's testimony (by deposition) simply was not credible to the court. He testified that his first knowledge of COAL came from Blatt's telephone call, less than ten days before the purchase. In that call, according to Pullman, Blatt informed him merely that 47,730 shares were available at $1.25 per share; that Milton Pepper was president of the company; that the company "was going to earn approximately a dollar a share or thereabouts"; and that in Blatt's opinion it was a good buy. Pullman contends that with no further questioning of Blatt, his lawyer for over eleven years, he made the investment.

During the succeeding six months Pullman received no financial information or reports from COAL. He did not know whether the company's earnings had begun to approach one dollar per share, as predicted. Pullman's only knowledge about the company's progress came when he asked someone, presumably Blatt, "how is Milton doing?" The answer was "Fine. The company is doing great."

In July Blatt asked Pullman at what price he would sell his shares. Pullman arrived at an asking price of $400,000 based upon his belief that stock was worth at least seven times earnings and that COAL was going to earn $1.00 per share. When the sale was consummated for $375,000 Pullman realized a profit of approximately $315,000 on his brief investment.

Looking at the entire record, we are not left with the "definite and firm conviction" that the lower court's finding was erroneous with respect to Pullman's knowledge. *See United States v. U. S. Gypsum Co.,* 333 U.S. 364, 394–95, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

The next finding challenged was that Blatt and Udell failed to disclose their bene-

ficial interest in the Naitove trust to Exquisite. Appellants' contention that they informed Exquisite of their interest primarily was based upon oral statements that they allegedly made to Exquisite's officers. The finder of facts was entitled to disbelieve appellants' testimony, which was ambiguous and was not corroborated by Exquisite's officers.

Appellants' argument that Exquisite had record notice of their interest is not supported. The record discloses no evidence that the Naitove trust shares were ever recorded in COAL's transfer books in the names of the beneficial owners.

Having concluded that the challenged findings of fact are due to be affirmed, we turn to appellants' challenges to the conclusions of law. Appellants first challenge the trial court's conclusion that Blatt's and Udell's failure to disclose their beneficial ownership of shares in the Naitove trust was an omission of a material fact.[6] The Commission's theory was that Exquisite would have been under a duty to inform the minority shareholders that COAL's counsel believed the merger to be so unfair as to object on their own behalf, had Exquisite known of the beneficial ownership.

Thus, we at the outset examine Exquisite's duty to disclose Blatt's negative feelings. Exquisite told the COAL shareholders that COAL's management had determined the rate of exchange to be more than fair and "to generously reflect current values," and that "management strongly recommends that you accept the offer." In fact, COAL's president, Milton Pepper, perfunctorily signed the statement presented to him by Exquisite. Exquisite, the 97% owner of COAL, did not consult the management of COAL and never asked its president whether he thought that the exchange was fair.

Blatt was not part of the management of COAL,[7] but his inside knowledge of the company and the value of its stock was unquestionable and was familiar to Exquisite.[8]

Under Rule 10b–5, the test for materiality is whether there is a substantial likelihood that a reasonable shareholder would consider the omitted information important in deciding upon his course of action. *Wheat v. Hall*, 535 F.2d 874 (5th Cir. 1976); see *T.S.C. Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); 2 Bromberg, *Securities Law— Fraud—SEC Rule 10b–5*, § 6.5 (214) (3) (1977). Considering the highly favorable recommendations being distributed, we are compelled to conclude that reasonable shareholders would have attached great importance to the fact that Blatt intended to dissent and viewed the offer as unfair. Knowledge of this fact certainly would

---

6. Rule 10b–5(2) proscribes the omission of any "material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading."

 Materiality has been described as "one of the most unpredictable and elusive concepts of the federal securities laws." *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 10 (1977).

7. Both Blatt and Udell were directors at times prior to Exquisite's acquisition. Neither held office at the time of the shareholders' meeting.

8. Blatt's association with COAL much predated Exquisite's:

 Blatt became COAL's attorney after Richard Sadowski acquired all its insider shares in a bankruptcy proceeding in June, 1965. At that time the company was nothing but a corporate shell with no assets or liabilities. Sadowski did little with the company and Blatt arranged for the sale of the shell to Milton Pepper for $10,-000 on March 21, 1966. Prior to the sale Blatt

and Udell, who had become Blatt's law partner, received 90,000 shares of stock as payment for $1500 in legal fees. Under Pepper's leadership, COAL became a very active company. Blatt served as a director until the acquisition by Exquisite. When the need for additional outside financing became apparent, Blatt brought Pepper into contact with officers of Exquisite. In October, 1967, Blatt, on behalf of the "Pepper Group" of inside shareholders, began negotiating with Exquisite for the 92% acquisition agreement which was accomplished on January 5, 1968. In July and August, 1968, Blatt negotiated with Exquisite for the purchase of Pullman's 47,730 shares.

 Blatt and Udell's association with COAL continued throughout the period of time here in question, as is illustrated by their filing the merger documents in connection with Exquisite's 100% acquisition.

place the shareholders' decision whether to dissent in a decidedly different context.

Well-established precedent in this circuit supports our view that Exquisite would have had a duty to disclose Blatt's dissent. In *Reed v. Riddle Airlines*, 266 F.2d 314 (5th Cir. 1959), the president and general manager possessed inside information about the value of his company's stock. We held that he had a fiduciary duty to disclose that information to minority shareholders before contracting to purchase their stock. *See also Mansfield Hardware Lumber Co. v. Johnson*, 263 F.2d 748 (5th Cir. 1959).

The case *sub judice* differs significantly from *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), relied upon by appellants. The Court held there that Rule 10b–5 does not encompass all breaches of fiduciary duty, finding that the Rule did not require any advance notice of a short-form merger to minority shareholders.[9] *Santa Fe* was factually analogous to the case *sub judice* in that minority shareholders in both cases practically had no alternative other than to accept the company's offer or to seek the statutory appraisal remedy in state court. The critical distinction comes from the full and fair disclosure provided by Santa Fe Industries to the subsidiaries' shareholders at an appropriate time.[10] *Santa Fe* does not control a case in which information that would prove useful to investors is withheld.

Assuming then that Exquisite would have been duty bound to disclose Blatt's dissent, we turn to the closer question of whether Blatt's failure to disclose his bene-ficial ownership was material. The closeness of this issue results from Exquisite's existing knowledge of Blatt's unfavorable opinion of its offer. Upon hearing the details of the planned acquisition of the minority stock, Blatt told Exquisite's top officers that he intended to object to the merger. Exquisite indisputably knew that Blatt had record ownership as trustee and that he transferred the trusteeship to Naitove for purposes of objecting. In all probability, Exquisite knew that Blatt controlled the investment decision for the shares.

These circumstances present an appealing argument that Exquisite's duty to disclose would not have been changed by knowledge of Blatt's beneficial ownership—i. e., that it already possessed any such duty. However, notwithstanding Exquisite's knowledge, we hold the non-disclosure material.

Disclosure of Blatt's beneficial ownership effectively would have sealed the lid on Exquisite's duty. It would have removed any doubts that Blatt was acting merely on instructions from some undisclosed principal. It would have demonstrated that Blatt's belief about the unfairness of the transaction was so strong that he was willing to put his own shares on the line. Exquisite might have been more aware that it was suppressing a material fact—the fact that Blatt objected for his shares—rather than merely a casual opinion.

The record gives no indication whether Exquisite would have acted any differently with knowledge of Blatt's ownership.[11] We should emphasize, however, that the test for materiality is objective.[12]

9. As described in *Santa Fe Indus.*, the Delaware "short-form merger" enables a parent company owning at least 90% of its subsidiary to merge with the subsidiary without advance notice to or consent by minority shareholders. Under this procedure the parent company may eliminate minority shareholders of the subsidiary by making cash payments to them for their stock.

10. The Court proceeded on the premise that "[t]heir [minority shareholders] choice was fairly presented, and they were furnished with all relevant information on which to base their decision." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 474, 97 S.Ct. 1292, 1301, 51 L.Ed.2d 480 (1977).

11. That Exquisite would have gone ahead with the merger is not at issue. Benjamin Oremland, general counsel and secretary of Exquisite, testified that in his opinion Exquisite would have consummated the merger in any event. Undoubtedly, owning 97% of COAL's stock, Exquisite had the voting power to execute the merger without the votes of any of the minority shares.

12. "The question of materiality, it is universally agreed, is an objective one, involving the signif-

All that is necessary is that Exquisite, acting reasonably, would have considered the fact important in deciding its course of action. We conclude that a reasonable company would have considered Blatt's ownership important in deciding what to disclose to the minority shareholders.

 Therefore, we hold that Blatt's failure to disclose his beneficial ownership was material. Disclosure to Exquisite was required under Rule 10b–5 to prevent the statement made to Exquisite that Naitove was owner of the trust shares from being misleading.[13] Thus, although Exquisite itself was not defrauded, it was misled in violation of the Rule. The fact that whatever real injury resulted from the violation was to shareholders of COAL and not to Exquisite does not foreclose the trial court's finding of a technical violation. That is not to say that a duty of disclosure ran from Blatt to the minority shareholders.[14] It is to say, however, that under the unique circumstances of this case Blatt's non-disclosure to Exquisite was misleading. Disclosure to Exquisite would have triggered a duty on its part to pass along information to the minority shareholders in which they had a vital interest.

The preceding discussion of the materiality of Blatt's non-disclosure applies similarly with respect to Udell. His failure to disclose his and Blatt's beneficial ownership to Exquisite was material, in violation of his duty not to mislead Exquisite.

We turn next to the issue of scienter. Subsequent to the decision of the court below, the Supreme Court decided *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), holding that proof of scienter is required in private damage actions brought under section 10(b) and Rule 10b–5. In a footnote, the Court reserved the question of requiring scienter in an action for injunctive relief.[15]

Although the post-*Hochfelder* issue of scienter in an injunctive action is novel to this court, it has been much discussed by commentators.[16] Other courts have reached differing conclusions.[17]

In *Hochfelder,* the lodestar for our inquiry, the Court found the language and history of § 10(b) dispositive of the appropriate standard of liability. Looking first to the statutory language,[18] the Court discovered clear evidence of congressional intent to proscribe only knowing or intention-

---

icance of an omitted or misrepresented fact to a reasonable investor." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 445, 96 S.Ct. 2126, 2130, 48 L.Ed.2d 757 (1976). *See Lewelling v. First California Co.,* 564 F.2d 1277 (9th Cir. 1977).

13. Alternatively, Blatt's special, inside relationship to COAL would give rise to a duty of disclosure to Exquisite. *See SEC v. Coffey,* 493 F.2d 1304, 1315 (6th Cir. 1974); *SEC v. Great American Indus., Inc.,* 407 F.2d 453, 460 (2d Cir. 1968) (*en banc*).

14. We emphasize for the sake of clarity that the court below made no findings of any nature with respect to a duty of Blatt running directly to the minority shareholders. Such issue is not raised in this appeal and we need not address it.

15. "Since this case concerns an action for damages, we also need not consider the question whether scienter is a necessary element in an action for injunctive relief under § 10(b) and Rule 10b–5." *Hochfelder,* 425 U.S. at 194, 96 S.Ct. at 1381, n. 12.

16. *See, e. g.,* Note, The Scienter Requirement in SEC Injunctive Enforcement of Section 10(b) After *Ernst & Ernst v. Hochfelder,* 77 Colum.L. Rev. 419 (1977); Comment, Scienter and SEC Injunctive Suits, 90 Harv.L.Rev. 1018 (1977); Lowenfels, Scienter or Negligence Required for SEC Injunctions Under Section 10(b) and Rule 10b–5; A Fascinating Paradox, 33 Bus.L. 789 (1978); Note, Scienter and Injunctive Relief Under Rule 10b–5, 11 Ga.L.Rev. 879 (1977).

17. *Compare SEC v. Bausch & Lomb, Inc.,* 420 F.Supp. 1226 (S.D.N.Y.1976) (scienter required), *aff'd on other grounds* 565 F.2d 8 (2d Cir. 1977) *with SEC v. World Radio Mission, Inc.,* 544 F.2d 535 (1st Cir. 1976) (scienter not required).

18. "The starting point in every case involving construction of a statute is the language itself." *Hochfelder,* 425 U.S. at 197, 96 S.Ct. at 1383. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (Powell, J., concurring).

al misconduct.[19] Nothing in the legislative history of § 10(b) or the administrative history of Rule 10b–5 contradicted the Court's narrow interpretation of the statute.[20]

*Hochfelder's* analysis applies forcefully to the issue *sub judice.* If the language and history of § 10(b) are dispositive in private damage actions, the same must also be true in SEC injunctive actions.[21] Both types of actions are creatures of the same statute; the language and legislative history are, of course, the same.[22] Just as the Court in *Hochfelder* pretermitted examination of extraneous "policy" considerations,[23] we need not look beyond the statute itself. *SEC v. Southwest Coal and Energy Co.,* 439 F.Supp. 820 (W.D.La.1977); *SEC v. American Realty Trust,* 429 F.Supp. 1148 (E.D.Va. 1977); *SEC v. Cenco, Inc.,* 436 F.Supp. 193 (N.D.Ill.1977); *SEC v. Bausch & Lomb, Inc.,* 420 F.Supp. 1226 (S.D.N.Y.1976), *aff'd on other grounds,* 565 F.2d 8 (2d Cir. 1977). *Cf. Collins Sec. Corp. v. SEC,* 562 F.2d 820 (D.C.Cir. 1977).

Historically, considerations of public policy have provided a means for distinguishing SEC actions from private damage suits. For example, in *SEC v. Texas Gulf Sulphur,* 401 F.2d 833, 868 (2d Cir. 1968) (concurrence), *cert. denied* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1976), Judge Friendly

wrote that under § 10(b) an injunction could issue for negligence, despite the scienter requirement for damage suits. He surmised that Congress did not mean "to deny a power whose use in appropriate cases can be of such great public benefit and do so little harm to legitimate activity." *Id.* In *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 193, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), an action under the Investment Advisers Act of 1940,[24] the Court suggested that the elements of a fraud action might vary with the remedy sought, and that the Commission might obtain injunctive relief without establishing all the elements required for damages.

■ Despite the appeal of such policy arguments, the language of the statute must control when sufficiently clear in its context.[25] In our judgment the language of § 10(b) controls. To justify an injunction on the basis of past violations the Commission must prove that the defendant possessed scienter, defined by the Supreme Court as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. at 193, 96 S.Ct. at 1381, n. 12.

Application of the requirement in damage actions has not produced a more precise

19. *Hochfelder,* 425 U.S. at 197–201, 96 S.Ct. 1375. The Court was particularly impressed by the patent connotations from the use of words such as "manipulative or deceptive" in conjunction with "device or contrivance."

20. In *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Court reiterated its unwillingness to expand the scope of § 10(b).

21. Perhaps the language and history of § 10(b) permit a stronger inference that Congress intended to require scienter in SEC actions than in private damage suits. The Supreme Court has determined that Congress did not contemplate private actions under § 10(b). *Hochfelder,* 425 U.S. at 196, 96 S.Ct. 1375. Therefore, it follows logically that the scienter requirement implicit in the statute must have been intended for SEC proceedings. *See* Note, Scienter and Injunctive Relief Under Rule 10b–5, 11 Ga.L. Rev. 879, 891 (1977).

22. One factor that influenced the Court in *Hochfelder* was the interrelationship of the civil liability provisions in the 1933 and 1934 Acts. The Court observed that wherever Congress intended to create civil liability for negligence it did so with clear specificity. *Hochfelder,* 425 U.S. at 207–08, 96 S.Ct. 1375. While the statutory scheme for SEC proceedings also contains express gradations of state of mind, *see, e. g.,* § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a) (1977), and § 15(b)(5) of the 1934 Act, 15 U.S.C. § 78o(b)(5) (1977), the variations generally may be described as less pronounced than the civil liability scheme. We do not find this difference dispositive.

23. *Id.* 425 U.S. at 214, 96 S.Ct. 1375, n. 33.

24. 15 U.S.C. § 80b–1 *et seq.* (1977).

25. *United States v. Oregon,* 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961), cited in *Hochfelder,* 425 U.S. at 201, 96 S.Ct. 1375.

definition of the standard for scienter.[26] In Hochfelder, the Court declined to specify the standard beyond holding that negligence is not sufficient.[27] The record in this action reveals knowing omissions by each appellant. The court below found that Blatt and Pullman had inside knowledge. Unquestionably they knew that the information was not disclosed to sellers of COAL stock. Their conduct, in our judgment, encompassed just the type of "knowing or intentional misconduct" that § 10(b) was intended to proscribe. See Hochfelder, 425 U.S. at 197, 212–213, 96 S.Ct. 1375, n. 32; SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d 90, 102 (2d Cir. 1978); cf. Arthur Lipper Corp. v. SEC, 547 F.2d 171, 180 (2d Cir. 1976). Likewise, in rejecting Blatt's and Udell's testimony that they had disclosed their interests in the Naitove trust to Exquisite, the court below implicitly found their actions knowing.

We are confident that "knowing" conduct satisfies the scienter requirement. Since the record on appeal conclusively indicates that each appellant acted with the requisite scienter, we are not compelled to remand for more specific findings.

We now turn to the propriety of the injunctive relief granted below. The court permanently enjoined appellants, Blatt, Pullman, and Udell from further violations of § 10(b), and ordered Pullman to disgorge his profits from the Exquisite transaction.

This court has said that "[t]he granting or denying of injunctive relief rests within the sound discretion of the trial court and will not be disturbed unless there has been a clear abuse of it." SEC v. MacElvain, 417 F.2d 1134, 1137 (5th Cir. 1972), cert. denied 397 U.S. 972, 90 S.Ct. 1087, 25 L.Ed.2d 265 (1970). While we adhere to that standard, we note that the seriousness of permanent injunctions recently has triggered closer appellate scrutiny of SEC injunctions than was found in earlier decisions.[28]

The trial court should consider several factors in deciding whether to issue an injunction in light of past violations.[29] The critical question in issuing the injunction and also the ultimate test on review is whether defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future. To obtain injunctive relief the Commission must offer positive proof of the likelihood that the wrongdoing will recur. SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d 90, 99–100 (2d Cir. 1978). The Commission needs to go beyond the mere fact of past violations. Id.

We have no difficulty in holding that the Commission carried its burden and that the trial court did not abuse its discretion in permanently enjoining Blatt and Pullman. Blatt was the apparent mastermind of the two violations. As the district court concluded, the nature and extent of his wrongdoing more than adequately sup-

**26.** See Note, The Scienter Requirement in SEC Enforcement of Section 10(b) After Ernst & Ernst v. Hochfelder, 77 Colum.L.Rev. 419, n. 2 (1977).

**27.** The Court expressly declined to state whether recklessness would be sufficient. Hochfelder, 425 U.S. at 193, n. 12, 96 S.Ct. 1375.

Likewise, we are not called upon in this case to decide whether recklessness is sufficient.

**28.** In SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d 90, 99 (2d Cir. 1978), Judge Friendly observed that

"[i]t is fair to say that the current judicial attitude toward the issuance of injunctions on the basis of past violations at the SEC's request has become more circumspect than in earlier days. Experience has shown that an injunction, while not always a 'drastic remedy' as appellants contend, often is much

more than the 'mild prophylactic' described . . . in SEC v. Capital Gains Research Bureau, Inc., 306 F.2d 606, 613 (2d Cir. 1962), a phrase quoted by the Supreme Court at 375 U.S. 180, 193, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963)."

**29.** Such factors include the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations. SEC v. Universal Major Industries Corp., 546 F.2d 1044, 1048 (2d Cir. 1976); SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1100 (2d Cir. 1972).

port the injunction against him. Similarly, although Pullman was implicated in only a single violation, it was reprehensible fraud. His continuing interest in investment opportunities strengthens the inference from his past conduct that he is likely to commit future violations.

With due respect for the discretion of the learned trial judge, we reach a different result with respect to appellant Udell. We find that the Commission failed to demonstrate a reasonable likelihood of future violation. Although we have concluded that Udell violated Rule 10b–5, the infraction cannot fairly be termed egregious. Udell's involvement was relatively minor. We find nothing in the record, other than this single violation, to suggest that Udell will violate the statute again. Therefore, we conclude that the trial court exceeded its discretion in finding a reasonable likelihood of future violation and in enjoining Udell.

The trial court acted properly within its equitable powers in ordering Pullman to disgorge the profits that he obtained by fraud.[30] This restitution merely forces the defendant to give up to the trustee the amount by which he was unjustly enriched. *SEC v. Manor Nursing Centers,* 458 F.2d 1082, 1104 (2d Cir. 1978); 2 Moore *Federal Practice* ¶ 38.24[2] at 190.5 (1977). The purpose of disgorgement is not to compensate the victims of the fraud, but to deprive the wrongdoer of his ill-gotten gain. *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 102 (2d Cir. 1978).

Disgorgement is remedial and not punitive. The court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing. Any further sum would constitute a penalty assessment. In *SEC v. Manor Nursing Centers, Inc.,* 458

F.2d 1082 (2d Cir. 1972), the court held that the trial court erred in ordering restitution of income earned on ill-gotten profits. The court held that the defendant could be compelled only to disgorge profits and interest wrongfully obtained.

The court ordered Blatt and Pullman to share in paying the trustee's expenses in collecting and disbursing the disgorged funds.[31] Pullman's foreign residency and web of foreign bank accounts and business entities create potential problems for the trustee's collection of the funds.

The established practice for compensating trustees and receivers in actions of this nature is that compensation should come from the funds recovered. *See, e. g., SEC v. First Securities Co. of Chicago,* 528 F.2d 449, 454 (7th Cir. 1976) (per curiam); *SEC v. Capital Counsellors, Inc.,* 512 F.2d 654 (2d Cir. 1975). Those who benefit from the trustee's actions bear the expense. *See generally Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Trustees v. Greenough,* 105 U.S. 527, 532, 26 L.Ed. 1157 (1887).

The Commission insists that the court here must employ its formidable equitable powers[32] to fashion a remedy that will not allow the frustration of justice. However, the facts before us suggest some likelihood that restitution may be had without the court's departing from the accepted practice and without the court ordering what would be a penalty assessment. Blatt did not receive any profits directly from Pullman's sale of stock to COAL, but he did receive "legal fees" from Pullman which the Commission has represented to be $3500. Richard Sadowski received approximately $12,000 for his efforts in soliciting sellers for Pullman.[33] Certainly, the court's

---

**30.** The court ordered Pullman to disgorge the sum of $313,377.50 in actual profits, plus interest. A trustee was appointed to receive the funds and to distribute them on a pro rata basis to the shareholders from whom Sadowski purchased 47,730 COAL shares.

**31.** The court also ordered Richard Sadowski, who agreed to a consent judgment and did not

appeal, to share jointly and severally in payment of the trustee's expenses.

**32.** *See J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

**33.** The judgment against Sadowski entered by consent on January 5, 1975, provided that any disgorgement by Sadowski should not exceed

equitable power is broad enough to permit it to order defendants to pay the trustee's expenses, up to the amount of the fee realized by each defendant for his assistance in executing the fraud.

■ We hold that the trial court erred in its general order requiring Pullman, Blatt and Sadowski to pay the trustee's expenses. The trustee's compensation and expenses should be paid out of the disgorged funds. The court below may require Blatt and Sadowski to pay an amount not exceeding the fees they received for their role in the fraud.

The judgment of the district court is affirmed in all respects except its injunction of Udell and its order taxing the costs of the trustee. We reverse and remand for modification of the order in accordance with this opinion.

AFFIRMED IN PART; VACATED IN PART; REVERSED AND REMANDED.

GEE, Circuit Judge, specially concurring and dissenting in part:

I find myself unable to concur in the judgment or opinion insofar as the injunction against Blatt rests on a determination that he violated Rule 10b–5 by failing to disclose to Exquisite his or Udell's beneficial interest in the Naitove Trust. Nor can I agree that Udell committed any violation of the rule, though the injunction against him is reversed on other grounds.

There is no such thing as a floating legal duty: such obligations must be attached at each end. Blatt and Udell each owed a duty not to mislead those who sold to or bought from him. Only Exquisite did this. Exquisite had a like duty to the other minority shareholders who bought from it. I am unable, however, to translate these discrete obligations into a duty running from Blatt or Udell to the other shareholders. Hence to this extent only, I respectfully dissent from the able opinion of the court.

$1000. While Sadowski is not a party to this appeal, we are aware that with respect to Sa-

dowski the trial court's actions on remand will be limited by the pretrial agreement.