SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Marvin L. WARNER, et al., Defendants.

FEDERAL HOME LOAN BANK BOARD, Plaintiff,

v.

AMERICAN SAVINGS AND LOAN ASSOCIATION OF FLORIDA, Defendant.

Nos. 86–6742–CIV–JAG, 86–1984–CIV–JAG.

United States District Court, S.D. Florida, N.D.

Nov. 11, 1987.

Nancy Van Sant, SEC, Miami, Fla., for S.E.C.

Arthur Mathews, Wilmer, Cutler & Pickering, Washington, D.C., Richard Smith, Coll, Davidson, Carter, Smith Salter, Barkett, P.A., Lewis Murphy, Steel Hector & Davis, Miami, Fla., for American Sav. and Loan Ass'n of Florida.

## ORDER

GONZALEZ, District Judge.

THIS CAUSE has come before the court upon the Motion for Preliminary Injunction filed by the Securities and Exchange Commission ("SEC"). The SEC seeks a preliminary injunction to restrain and enjoin defendant American Savings and Loan Association of Florida ("ASLA") from further violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder.

The original complaint in this matter was filed on September 15, 1986. The complaint sought permanent injunctions against seven individuals [1] and ASLA. All but two of the defendants, Marvin Warner and ASLA, consented to entry of Final Judgment against them.

The complaint charged illegal and fraudulent conduct by the defendants in connection with their association, dealings, and transactions with and participation in the business of E.S.M. Government Securities, Inc. ("E.S.M." or "Government"), and its corporate affiliates, E.S.M. Group, Inc. ("Group"), E.S.M. Financial Group ("Financial"), and E.S.M. Securities, Inc. ("E.S.M. Securities") (collectively referred to as the "E.S.M. Companies"). For purposes of this motion, the court is only concerned with ASLA's involvement and transactions with E.S.M.

ASLA is a savings and loan association chartered by the State of Florida. ASLA's common stock and its series A convertible Preferred Stock are listed and traded on the New York Stock Exchange, Inc. and both issues have been traded at least since 1983. ASLA has also filed periodic reports with the Federal Home Loan Bank Board ("FHLBB"), pursuant to section 12(i) of the Exchange Act, *as amended*, 15 U.S.C. § 78*l*(i). These reports have been publicly disseminated and provided to investors in ASLA's securities.

E.S.M. was a Fort Lauderdale, Florida-based corporation which acted as a broker-dealer from 1975 until March 4, 1985, purchasing and selling U.S. Government and Government-guaranteed securities. E.S.M. dealt principally with financial institutions, municipalities, and other broker-dealers nationwide.

E.S.M. engaged in repurchase transactions and reverse repurchase transactions with its customers. A "repurchase transaction" involves the sale of securities with a simultaneous agreement to repurchase them at a later date at a fixed price. A "reverse repurchase transaction" involves the purchase of securities with an agreement to sell the securities at a later date at a fixed price. For purposes of this Order, both transactions will be referred to as "repurchase transactions."

On March 4, 1985, this court, in a related case, entered a Final Judgment of Permanent Injunction and Other Equitable Relief, permanently enjoining E.S.M. and the above-named corporate affiliates from further violations of the anti-fraud provisions of the securities laws. The court also froze the defendants' assets and placed the companies in receivership. *Securities and Exchange Commission v. E.S.M. Government Securities, Inc., et al.,* Civil Action No. 85–6190–CIV–Gonzalez (S.D.Fla., filed

---

**1.** The individuals named in the complaint are Marvin L. Warner, Ronnie R. Ewton, George G. Mead, Nicholas B. Wallace, Charles W. Streicher, Thomas F. Saunders, Timothy R. Murphy, Burton M. Bongard, David J. Scheible, and Robert J. Weeder.

Marvin Warner was chief executive officer of ASLA between March 1984 and January 1985.

He also controlled Home State Savings Bank, an Ohio-chartered savings and loan association. Ewton, Mead, Wallace, Streicher, Saunders and Murphy were officers, directors and/or employees of the E.S.M. Companies. Bongard, Scheibel and Weeder held various positions at Home State.

March 4, 1985) [Available on WESTLAW, DCT database]. The defendants consented to the entry of final judgment, without admitting or denying the allegations in the Commission's complaint. On March 26, 1985, an involuntary petition in bankruptcy was filed by certain of Government's creditors, and on March 27, 1985, it was adjudicated bankrupt. By further Order of this court on June 19, 1985, Government was made the subject of a stockbroker liquidation proceeding under Subchapter III of Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. § 741 *et seq.* *In re E.S.M. Government Securities, Inc., Debtor,* Case No. 85–6254–CIV–Gonzalez.

The SEC's allegations of fraud on the part of ASLA arise from ASLA's dealings with E.S.M. In May and June 1984, ASLA engaged in a series of inter-related leveraged arbitrage repurchase transactions with E.S.M. The transactions involved ASLA's purchase of $1 billion (face amount) of U.S. Treasury Bills due to mature in May and June of 1985, for a discounted price of $892 million. The transactions were financed through the contemporaneous sales by ASLA of the Treasury Bills for approximately $792 million subject to agreements by ASLA to repurchase them on their respective maturity dates. ASLA financed the remaining amount by selling $108 million (face value) U.S. Treasury Notes, which it previously owned for approximately $100 million, with a concurrent agreement to repurchase them approximately one year later on the respective maturity dates of the Treasury Bills.

The S.E.C. alleges that ASLA violated section 10(b) and Rule 10b–5 by failing to disclose to its investors the risks and contingencies involved in its transactions with E.S.M. ASLA allegedly issued misleading information to the public through its shareholder reports, press releases, proxy materials and annual and quarterly reports filed with the Federal Home Loan Bank Board (FHLBB). The SEC claims that ASLA repeatedly conveyed the impression of dynamic growth and record earnings using a conservative investment strategy despite knowledge by ASLA's officers and directors [2] that the transactions with E.S.M. were fraught with uncertainty and risk.

ASLA's officers and directors were allegedly concerned about the risks as early as June 1984. This concern prompted ASLA to request a report from Alexander Grant (E.S.M.'s auditors) analyzing the E.S.M. transaction. ASLA also retained the law firm of Kelley Drye & Warren ("Kelley Drye") to review ASLA's position in the event of bankrtupcy of E.S.M. These reports disclosed several problems with the transactions.

According to Grant, the physical location of ASLA's $114 million in T–Notes and $1 billion (face amount) T–Bills was not known. Grant also stated that the third-party lenders were not all municipalities as E.S.M. had represented.

Kelley Drye classified the transaction as a $100.1 million unsecured loan made by ASLA to the various principals. This figure represents the difference between the price paid by ASLA to purchase the Treasury Bills, and the proceeds received by ASLA on the sale of the T–Bills. Kelley Drye also concluded that ASLA had assumed the risk of default by the borrowers.

In early September 1984, soon after reviewing the Kelley Drye report, ASLA directors met with several individuals from E.S.M. It was determined that the arbitrage transactions would be unwound prior to maturity.

In October 1984, the FHLBB and State examiners completed their annual examination of ASLA. The examiners expressed concern that ASLA's borrowings were excessively overcollateralized and that ASLA

**2.** According to ASLA, during the period in question, its management was divided into two camps: the "Broad–Mahoney team" and the "Warner regime." ASLA claims that its investment portfolio and public filings were handled by Warner and the officers and directors appointed by him.

Warner's interest in ASLA was bought out by ASLA in January 1985. Warner, Ewton and the other Warner officers all resigned in January 1985. ASLA is now managed once again by the "Broad–Mahoney team" which includes Shepard Broad, Morris Broad and Edward Mahoney.

had no control over the identiy or financial strength of the lenders.

The SEC argues that given the information obtained by ASLA's directors between June and October 1984, ASLA had adequate notice of the risks involved in the E.S.M. transaction. Nevertheless, ASLA persisted in publishing optimistic statements regarding its financial well being. For example, in a July 23, 1984 press release, ASLA reported a 48 percent increase in consolidated assets (to $4,306,967,000.00) derived "principally by short-term arbitrage transactions." ASLA's Third Quarter Report for the period ending June 30, 1984 was distributed in August 1984. The Report attributed ASLA's 28 percent increase in net interest income to a "positive restructuring of the investment portfolio." In neither case did ASLA disclose the risks and problems about which its directors and officers allegedly knew.

ASLA also issued a preliminary earnings release announcing net earnings (unaudited) on October 31, 1984. The release listed ASLA's net earnings for the 1984 fiscal year as $18,390,000.00 and attributed a 32 percent increase in assets principally to "short-term arbitrage transactions." However, the release failed to disclose the nature of the arbitrage transaction, its risks, and the fact that the transaction was being unwound prior to maturity.

The SEC also charges that ASLA failed to disclose the risks of the E.S.M. transaction in its Form 10-k for the fiscal year ended September 30, 1984 (filed with the FHLBB), its 1984 Annual Report and its Form 10-Q for the quarter ended December 31, 1984 (also filed with the FHLBB). Each of these filings stressed the increases in ASLA's assets without disclosing the known risks. In fact, the SEC contends that ASLA's management did not disclose the risks of the E.S.M. transaction in its public filings until after the collapse of E.S.M.

Finally, the SEC charges that ASLA disseminated misleading information regarding ASLA's buy-out of Marvin Warner's 1,905,000 shares of ASLA stock. On December 17, 1984, the FHLBB granted approval to ASLA to use up to $26.7 million

in ASLA's assets to buy Warner's shares in ASLA. According to the SEC, the approval was conditioned on ASLA's replacing its capital within a certain time and Shepard Broad's guarantee of ASLA's obligation.

In December 1984, ASLA informed the *Miami Herald* that Shepard Broad had elected to purchase Warner's stock and that "no financing for the buyout ha[d] been arranged." ASLA also issued a press release on December 24, 1984 which announced the buyout but failed to disclose that up to $26.7 million in ASLA's assets would be used to purchase Warner's stock. Not until after the transaction had been consummated did ASLA announce that its assets, and not Broad's, had been used for the purchase.

■ The SEC contends that the disclosures (and non-disclosures) described above were fraudulent within the meaning of section 10(b), 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5. ASLA hotly disputes the SEC's conclusion. In particular, ASLA claims that the SEC has failed to prove the requisite element of scienter. *See Aaron v. SEC,* 446 U.S. 680, 689–91, 701–02, 100 S.Ct. 1945, 1951–53, 1958–59, 64 L.Ed.2d 611 (1980) (scienter is necessary element under section 10(b)). In this circuit, scienter may be established by a showing of knowing misconduct or severe recklessness. *SEC v. Carriba Air, Inc.,* 681 F.2d 1318, 1324 (11th Cir.1982).

ASLA contends that during the time period in question, its investment portfolio was being managed by Marvin Warner and several other officers who had been hired by Warner. ASLA's present management team (the Broads and Mahoney) was effectively shut out of investment decisions and the preparation of public disclosures and filings. The present management team did not act with scienter in failing to disclose the risks involved in the E.S.M. transaction because it did not know of the risks.

■ The SEC argues that the facts as set forth above show that preliminary injunctive relief is necessary. In order to obtain injunctive relief "in a case where current violations [of the securities laws] are not alleged, the SEC must establish that there is a reasonable likelihood that

the defendant, if not enjoined, will engage in future violations of the securities laws." *SEC v. Mize*, 615 F.2d 1046, 1051 (5th Cir. 1980).

■ "[T]he decision whether to grant or deny injunctive relief is addressed to the sound discretion of the district court." *SEC v. Caterinicchia*, 613 F.2d 102, 105 (5th Cir.1980). The court must, however, view the evidence in the light most favorable to the SEC and the SEC "is entitled to the benefit of all reasonable inferences." *SEC v. Blatt*, 583 F.2d 1325, 1328 (5th Cir.1978).

■ In making its decision, the court must consider several factors, including

the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

*Blatt*, 583 F.2d at 1334 n. 29. The SEC must also go beyond the mere fact of past violations and offer *"positive proof"* of the likelihood of further violations in the future. *Id.* at 1334 (emphasis added). "Thus, it is not a single factor, but rather the sum of the circumstances surrounding the defendant and his past conduct that governs whether to grant or deny injunctive relief." *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. Unit A July 1981).

■ Even assuming, *arguendo*, that the SEC has established that ASLA violated section 10(b) and rule 10b–5, the inquiry is not complete. The court must determine whether there exists "positive proof" of a likelihood of future violations. The court has thoroughly reviewed the pleadings and exhibits submitted on behalf of the parties and has heard the testimony of witnesses and argument of counsel and has determined that preliminary injunctive relief is not warranted. The SEC has failed to prove the likelihood of further violations by the defendant.

First, the violations occurred more than two and one half years ago. Between March 4, 1985 (the date E.S.M.'s fraud was discovered) and October 5, 1987 (the date of this hearing) the SEC could only point to one incident which could possibly be termed a violation of the securities laws by ASLA. That incident involved a press release issued by ASLA on January 30, 1987 in which ASLA disclosed Shepard Broad's intention to purchase ASLA's common stock in fulfillment of his guarantee to replace the capital expended in the Warner buyout. The press release did not disclose that the FHLBB rejected the price at which Broad proposed to purchase the shares. However, ASLA followed the press release up with a Form 8-k filed with the FHLBB on February 3, 1987. That public filing disclosed the terms of Broad's proposed purchase, including the sale price of the shares. In a Form 10–Q filed by ASLA on February 13, 1987, ASLA disclosed not only the proposed price, but also the fact that the FHLBB rejected the proposal.

Morris Broad testified that the purpose of the press release was to inform the public of the disagreement between ASLA and the FHLBB over whether ASLA had complied with its obligation to replace the capital used in the Warner buy-out. The press release was a short announcement by ASLA which was followed up by public filings with the FHLBB. The court can find no fraudulent conduct in connection with ASLA's January 30, 1987 press release.

Second, the circumstances surrounding the E.S.M. transaction were unique and are unlikely to recur. E.S.M. has been dismantled and its massive fraud disclosed. Furthermore, neither ASLA nor its current management received ill-gotten gains through the deal with E.S.M. When the potential problems with the transaction were identified, ASLA immediately instructed E.S.M. to unwind the transaction.

Third, the individuals who constructed the E.S.M. transaction, Ronnie Ewton and Marvin Warner, are no longer on the Board of Directors of ASLA. The officers who were hired by Warner are no longer with ASLA. The present management team has taken steps to insure that its public filings are accurate and complete.

ASLA also argues that a proposed buy out of ASLA by Kinder–Care makes it highly unlikely that future violations of securities laws will occur. If the purchase goes through, ASLA's management will be replaced. The SEC argues that the proposed purchase increases the need for preliminary relief in order to insure that shareholder approval of the transaction is properly obtained. As discussed above, the SEC has failed to show any threat of future violations of the securities laws by ALSA under its present management. Thus, the impending Kinder–Care buy-out is not relevant to the issue of whether future violations are reasonable likely to occur. Furthermore, the SEC has not shown any likelihood that ASLA may violate the securities laws in the process of obtaining shareholder approval of the Kinder–Care transaction.

For the foregoing reasons, it is hereby

ORDERED AND ADJUDGED that the Motion for Preliminary Injunction as to Defendant American Savings and Loan Association of Florida be and the same is DENIED.