EDITH H. JONES, Circuit Judge, dissenting: I respectfully dissent from the majority’s decision to throw the book at these defendants—approving an injunction, a lifetime ban on all “penny stock” trades, a civil penalty, and disgorgement of gross revenues. Yet no fraudulent injury occurred to the sophisticated actors with whom they traded or the penny stock market more generally. The district court’s perfunctory analysis of the six factors used to justify such harsh penalties is insufficient. There is no justification for a lifetime penny stock bar under the circumstances of this case. Finally, the requirement of disgorging gross revenues conflicts with SEC v. Blatt, 583 F.2d 1325 (5th Cir. 1978), the principal authority cited by the panel majority. The SEC acknowledges that this is a strict liability violation for which no proof of scienter was required. Moreover, only one meaningful district court precedent, which postdated these appellants’ trades, spoke to the required location of the transactions controlling the Rule 504(b)(l)(iii) exemption. The panel majority must stretch to infer from the district court’s opinions that Kahlon and TJM committed “reckless and quite likely knowing violations” of the Rule. The majority admit that the district court’s findings were not “extensive,” not “explicit,” and “did not give us much to go on.” Because SEC was not required to bear a burden of proving scienter for the initial violation, and no evi-dentiary hearing took place, it is at best conjecture that Kahlon and TJM were intentional or willful violators. There is no evidence that they have been repeat securities law offenders: while they used this Rule’s exemption in the same way many times, once the SEC notified him that it was considering charges, Kahlon and TJM immediately ceased engaging in these Rule 504 transactions. There is no evidence that such misconduct will recur now that the transactions have been adjudicated deficient. Also of significance, there was no proof of fraud committed upon the entities from which Kahlon and TJM purchased stock or upon the sophisticated markets in which they sold. There were, in sum, no egregious underlying securities violations. For the technical violations that occurred, however, I agree that several sanctions, including the permanent injunction against further securities law violations and the civil penalty, should be upheld. But the ban against these appellants’ ever engaging in penny stock trades, in my view, far exceeds the district court’s discretion. Disturbingly, the panel majority purports to “find few clear limits on the district court’s discretion” in issuing this ban. That is not consistent with SEC v. Blatt, 583 F.2d 1325, 1334 (5th Cir. 1978). In Blatt, the court held that: the critical question in issuing the injunction and also the ultimate test on review is whether defendant’s past conduct indicates that there is a reasonable likelihood of further violations in the future. To obtain injunctive relief the Commission must offer positive proof of the likelihood that the wrongdoing will recur. SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d 90, 99-100 (2d Cir. 1978). The Commission needs to go beyond the mere fact of past violations. Id. Id. (emphasis added). In Blatt, unlike this case, the defendants violated SEC Rule 10b-5 by engaging in blatant and misleading nondisclosures during a contested acquisition. In Blatt, unlike this case, the appellate court reviewed factual findings made following a trial. The record here, I respectfully submit, fails to go “beyond the mere fact of past violations.” In addition to the lack of “proof positive” compatible with Blatt, the bar on any fu-. ture penny-stock trades is overbroad because it places these, defendants at risk under,circumstances wholly beyond their control. The majority acknowledges that not all penny stock transactions are Rule 504 transactions. Kahlon’s and TJM’s abuse of the rule governing purchases of unregistered securities directly from companies should not bar them permanently from investing in over-the-counter securities. To begin, the price of a stock can fluctuate above or below $4,99/share on the open market, so a penny stock today may not be one tomorrow, and vice versa. Moreover, the regulations define penny stock as “any equity security other than a security”-that meets any of a number of potential requirements. These extrinsic factors create more ways for a penny stock to become not a penny stock and vice-versa.[1] 17 C.F.R. 240,3a51-l. Given the amount of legitimate trading activity this ban will proscribe, a broad permanent penny stock bar is an abuse of the district court’s discretion.[2] As the relevant factors imply, any ban on trading must be tailored to the degree of misconduct. This is not a case where Kahlon and TJM have systematically abused penny stock offerings, resulting in numerous regulatory violations; instead, they exploited one rule to conduct their transactions. In other cases, the defendants violated multiple provisions of the Securities Act and the Exchange Act, notably including allegations of fraud, while trading penny stocks, so a broad penny stock bar was warranted. See S.E.C. v. Gillespie, 349 Fed.Appx. 129, 130 (9th Cir. 2009) (“Gillespie violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act.”); S.E.C. v. Curshen, 372 Fed.Appx. 872, 875 (10th Cir. 2010) (“Mr. Curshen’s conduct violated 15 U.S.C. § 78j(b) (“ § 10(b)”), 15 U.S.C. § 77q(a) (“§§ 17(a)(1)-(3)”), 15 U.S.C. § 77q(b) (“§ 17(b)”), and 17 C.F.R. § 240.10b-5 (“Rule 10b-5”).”); S.E.C. v. Simmons, 241 Fed.Appx. 660, 662 (11th Cir. 2007) (“Sicili-ano had committed securities fraud and violated the registration provisions of the securities laws”). In the Offill case, the district court tailored a penny stock ban, limiting it to seven years for some defendants to protect the public without “over-punishing these defendants ....” S.E.C. v. Offill, No. 3:07-CV-1643-D, 2012 WL 1138622, at *5 (N.D. Tex. Apr. 5, 2012). The court imposed a permanent penny stock ban only on the former SEC lawyer whose “knowledge and experience as a securities regulator make him especially dangerous to the investing public.” Id. at *6. No nuanced findings or balancing occurred here. Because Kahlon and TJM violated one provision, were not found guilty of fraud, immediately ceased Rule 504 transactions after being singled out by the SEC, and have agreed not to engage in any further transactions based on that rule, a tailored ban would only prevent them from engaging in any Rule 504 transactions. Next, I turn to the disgorgement and prejudgment interest calculation, which are based not on lost profits but on the gross revenues received by the appellants. This court observed only in an unpublished, non-precedential decision that “the overwhelming weight of authority hold[s] that securities law violators may not offset their disgorgement liability with business expenses.” SEC v. United Energy Partners, Inc., 88 Fed.Appx. 744, 746 (5th Cir. 2004). This statement is overbroad at best: the “overwhelming majority” of SEC enforcement actions involve fraud, where the SEC has proven an offender’s scienter and the harm done to others. Even more pointedly, the Blatt case, on which the majority relies, did not result in disgorgement based on gross revenue achieved by a securities law violator, but only on “the profits that he had realized through violation of the [SEC] Act...” Blatt; 583 F.2d at 1327. (Compare Id. at 1328, noting the sale of Pullman’s stock for $375,000, yielding an approximate profit of $315,000; only the latter • amount was required to be disgorged.) Disgorgement, if appropriate at all, should be remanded for reduction in line with Blatt. As an aside, the district court appears to have adopted remedies relying on the underwriter theory of the case, on which it did not rule, rather than the Rule 504 transactions on which it actually found liability. Had Kahlon and TJM been prosecuted and held liable as underwriters this sweeping range of punishment would have made more sense. Underwriters, after all, are responsible for distributing securities into the market at large. Because the district court decision is based only on a technical strict liability violation, I consider the aggregate of these penalties an abuse of discretion. Finally, I find it troubling that Kahlon and TJM never had a chance to present their case orally before the district court. A pretrial order set the timetable leading to the trial on, remedies, and it was followed until about a week before trial. Then counsel for both parties informed the court that they were only planning to offer arguments at the remedy phase, but no additional evidence. The district court not only cancelled the trial, but also denied Kah-lon’s specific request to permit argument, and accepted every bit of SEC’s punitive remedies—a civil penalty, injunction against future SEC violations, disgorgement of gross revenue gained plus interest, and the lifetime penny stock trade ban. The panel majority’s insistence on this plethora of punishments, including the disgorgement of gross revenues plus interest treats this case, inappositely, as if Kahlon and TJM had stolen from widows and retirees. Equally inapt, in light of Blatt, is the nostrum that “there are few clear limits on the district court’s discretion.” If federal courts decline to exercise proportionality in penalizing technical regulatory violations, then one can only hope that a federal agency with such enormous power as the SEC will learn to better fit the punishments to the crime. I respectfully dissent. . The regulation governing-what is a penny stock includes qualifications ' entirely in the hands of the issuer (17 C.F.R. 240.3a51-l(g)), For example, Kahlon could purchase stock from a one year old issuer with two million dollars in net tangible assets, but if in year two the issuer dips below two million in net tangible assets, the stock becomes a penny stock, Other qualifications are left entirely in the hands of the marketplace (240.3a51-l(d)). Finally, whether a stock can qualify as a penny stock may be determined by certain securities exchanges, e.g., if the stock is'removed from the exchange, if the exchange decides to stop reporting certain information, or the stock fails to meet other ongoing qualification requirements (240.3a51-l(a), (e)). Obviously, if Kahlon purchased a stock valued at $6/ share, but it declined to $4/share, he would be barred from selling or trying to sell it. But his risk goes well beyond market value fluctuations to the other rules governing these stocks, . "The impact of a Penny Stock Bar is that the individual is barred from acting as a promoter, finder, consultant or agent or otherwise engaging in activities with a broker, dealer, or issuer for the purpose of the issuance or trading in any penny stock, or inducing or attempting to. induce the purchase or sale of any penny stock.” Brenda Hamilton, What is a Penny Stock Bar?, Securities Lawyer 101 (August 2, 2014), https://www. securitieslawyer 101 .com/2014/penny-stock-bar/, See also David'Smyth, Don't Even Think About Violating That Penny Stock Bar, The National Law Review (June 13, 2016), https:// www.natlawreview.com/article/don-t-even-think-about-violating-penny-stock-bar (Wise' violated a penny stock bar when he "solicited several private companies to issue publicly trading shares, pitched the offerings to a New York-based hedge fund, and helped the private companies prepare to offer the shares to the public.”).