**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Mark MEGALLI, Defendant.**

**CIVIL ACTION NO. 1:13–cv–3783–AT**

United States District Court, N.D. Georgia, Atlanta Division.

Signed 09/24/2015

Madison Graham Loomis, Pat Huddleston, II, Securities & Exchange Commission, Atlanta, GA, for Plaintiff.

Paul Monnin, Andrea Pearson, Eric David Stolze, S. Tameka Phillips, Paul Hastings LLP, Atlanta, GA, for Defendant.

## *ORDER*

Amy Totenberg, United States District Judge

This matter is before the Court on the Plaintiff's Motion for Summary Judgment [Doc. 29], and Defendant's Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment [Doc. 27]. Plaintiff Securities and Exchange Commission ("SEC") brought this civil enforcement action against Defendant Mark Megalli, alleging that Megalli violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5 by trading Carter's, Inc. ("Carter's") stock while in the possession of material non-public information ("inside information") concerning that company. Megalli has already pled guilty to a criminal charge arising from the same alleged conduct. *U.S. v. Megalli*, No. 13–cr–0442–RWS, Doc. 9 (N.D.Ga. Nov. 25, 2013.)

For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion for Summary Judgment [Doc. 29], and **DENIES** Defendant's Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment [Doc. 27]. The Court also **DENIES** Defendant's Motion for Oral Argument [Doc. 46].

## I. BACKGROUND.

Mark Megalli was hired in 2009 by Level Global, a New York-based hedge fund, to launch a consumer group, hire analysts, and manage capital on behalf of the firm. (Defendant's Response to Plaintiff's Statement of Material Facts ("Def.'s Resp. SMF") ¶ 7.) On September 14, 2009, Megalli, on behalf of Level Global, entered

into an agreement with a consulting firm owned by Eric M. Martin, a former Vice President of the Atlanta-based children's clothing company, Carter's, Inc. ("Carter's) (Def.'s Resp. SMF ¶¶ 10–12.) Megalli knew that Martin had recently left Carter's and assumed that he continued to have relationships at Carter's. (Def.'s Resp. SMF ¶¶ 13–14, 17.)

▇ Martin did in fact continue to have relationships at Carter's, including with Richard Posey, a vice president at the company. (Def.'s Resp. SMF ¶ 15.) Martin and Posey had worked at Carter's together, and developed a "personal and professional relationship." *U.S. v. Megalli,* No. 13–cr–442–RWS Doc. 9 at pp. 18:20–25; 19:15–20 (N.D.Ga., Nov. 25, 2013)[1] ("Guilty Plea Transcript."); *see also* (Plaintiff's Response to Defendant's Statement of Material Facts ("Pl.'s Resp. SMF") ¶¶ 6–12.) Posey disclosed inside information to Martin concerning Carter's. (Defendant's Response to Plaintiff's Statement of Additional Material Facts ("Def.'s Resp. to SAMF") ¶ 15) (Doc. 39–1.) Martin, in turn, passed that inside information to Megalli, who then made trades in Carter's stock based in part on the inside information between September of 2009 and July of 2010. (Def.'s Resp. SMF ¶¶ 22, 36.)

More specifically, Martin made a call to Megalli on October 23, 2009, where he disclosed inside information and recommended Megalli sell any stock he had in Carter's. (Def.'s Resp. SMF ¶ 20.) While still on the telephone with Martin, Megalli messaged Level Global's head of trading and asked that individual to liquidate Level Global's Carter's holdings, which were valued at nearly $9 million dollars at the time. (Def.'s Resp. SMF ¶ 21; Guilty Plea Transcript at pp. 20:13–20, 25:1–2) While Megalli relied in part on other information in deciding whether or not to sell Carter's stock, he stated at his plea hearing that the call with Martin during which he received inside information was "a catalyst ... to continue selling [Carter's] stock." (Guilty Plea Transcript at p. 26:1–2; *see also* Def.'s Resp. SMF ¶ 23.)

Megalli's insider trading continued beyond 2009. In July of 2010, Megalli sold short positions in Carter's stock based on inside information he had received from Martin, generating profits for Level Global of $648,655. (Def.'s Resp. SMF ¶¶ 33–34.) All told, these trades helped Megalli's employer Level Global avoid losses of $2,034,000.00 (Def.'s Resp. SMF ¶ 26, Ans. ¶ 24) and gain profits of $648,655. (Def.'s Resp. SMF ¶ 34; Ans. ¶ 42.) During the entirety of this time, Megalli consciously avoided knowledge concerning the source of Martin's inside information. (Def.'s Resp. SMF ¶ 36; Guilty Plea Transcript at p. 25:7–8 ("[w]hat I'm pleading guilty to here today is conscious avoidance").)

The United States brought a criminal action against Megalli, alleging he conspired to engage in insider trading in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b–5. (Plaintiff's Motion for Summary Judgment ("Pl.'s MSJ") Ex. 1.) Megalli pleaded guilty to the criminal information filed in that case and the court entered a judgment of guilty. (Pl.'s MSJ, Exs. 2, 7; Pl.'s Resp. SMF ¶ 1.) The SEC filed an action seeking to hold Megalli civilly liable for his alleged violations of securities laws alongside the criminal case. (Compl., Doc. 1.)

---

1. These portions of the Guilty Plea Transcript were, for some unexplained reason, not submitted by the SEC. Nonetheless, the Court may take judicial notice of guilty pleas because they are "not subject to reasonable dispute." *Colonial Penn. Ins. Co. v. Coil,* 887 F.2d 1236, 1239–40 (4th Cir.1989) (taking judicial notice of guilty plea); *U.S. v. Ferguson,* 681 F.3d 826, 834 (6th Cir.2012) (same).

## II. STANDARD OF REVIEW ON SUMMARY JUDGMENT.

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be granted only if no rational fact finder could return a verdict in favor of the nonmoving party. *Id.* at 249, 106 S.Ct. 2505.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The moving party need not disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. *Id.* at 324–26, 106 S.Ct. 2548. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir.2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir.1984). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

## III. DISCUSSION.

Section 10(b) of the Securities Exchange Act and its implementing regulations prohibit corporate insiders from trading based on confidential information obtained due to their position within their company. 15 U.S.C. § 78(j)(b); 17 C.F.R. § 240.10b–5; *SEC. v. Yun*, 327 F.3d 1263, 1269 (11th Cir.2003). The Act also prohibits downstream recipients of inside information, known as "tippees," from trading on that information if they "know[ ] or should know" that disclosure of the information was accompanied by the insider's breach of a fiduciary duty. *Dirks v. S.E.C.*, 463 U.S. 646, 660, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). "Tippee liability" serves to prevent insiders from passing along their advantages to others, thereby reaping personal, material, or reputational

benefits, while not actually engaging in trading themselves. In other words, "the insider ... [is] forbidden from doing indirectly what they are forbidden from doing directly." *Yun,* 327 F.3d at 1269–70.

◾ Two components of tippee liability are important to define for the purposes of this case. First is what it means when a tippee "knows or should know" that an insider has breached a duty. Actual knowledge of the breach is not required. Instead, if a tippee "consciously avoids" knowledge that an insider has breached a duty, they are still liable. *SEC v. Obus,* 693 F.3d 276, 288–89 (2d Cir.2012) (reversing district court grant of summary judgment for defendant and holding remote tippee liability may be based on conscious avoidance). The reason for this is plain— "to hold otherwise would subvert the laws against fraudulent trading in securities" by permitting downstream tippees to avoid liability even when they know that something is fishy by choosing to close their eyes and plug their ears. *SEC v. Musella,* 678 F.Supp. 1060, 1063 (S.D.N.Y.1988) (conscious avoidance supported liability). The phrase "conscious avoidance" itself indicates that the tippee is aware—"conscious"—that they are likely receiving inside information disclosed in exchange for an improper benefit. They know there is a problem—they just don't want to know the details.

◾ The second important component of tippee liability is what constitutes a "breach" of a fiduciary duty. The mere fact of disclosure of inside information by an insider is not by itself a breach, because not all disclosures are inconsistent with the duty an insider owes to their company or shareholders. *Dirks,* 463 U.S. at 661–62, 103 S.Ct. 3255. Instead, the test to determine whether a disclosure is also a breach is "whether the insider personally will benefit, directly or indirectly, from his disclosure." *Id.* at 662, 103 S.Ct. 3255. In

short, without a benefit, there is no breach. *See id.; see also U.S. v. Newman,* 773 F.3d 438, 449 n. 4 (2d Cir.2014) (citing *U.S. v. Santoro,* 647 F.Supp. 153, 170–71 (E.D.N.Y.1986), *rev'd on other grounds sub* nom., *U.S. v. Davidoff,* 845 F.2d 1151 (2d Cir.1988) ("[a]n allegation that the tippee knew of the tipper's breach necessarily charges that the tippee knew that the tipper was acting for personal gain")).

◾ The Eleventh Circuit has recognized that the Supreme Court defined benefit "in very expansive terms" in the *Dirks* case. *Yun,* 327 F.3d at 1280. The "showing needed to prove an intent to benefit is not extensive," and includes both actually pecuniary benefits and more inchoate, reputational benefits that are likely to translate into future earnings. *Id.* It also includes circumstances where the insider is unlikely to receive any pecuniary benefit at all, such as when the insider "make[s] a gift to a trading relative or friend." *Id.* In that circumstance, the tip and trade resemble a trade by the insider himself, followed by a gift of profits to the tippee, *Dirks,* 463 U.S. at 664, 103 S.Ct. 3255, and the "intention to benefit the particular recipient" of the tip is a sufficient benefit to create liability. *Id.*

Thus, in *Yun,* the Eleventh Circuit held that an executive's wife who disclosed inside information about her husband's company to a work friend with whom she sometimes shared real estate commissions "expected to benefit from her tip to [her friend] by maintaining a good relationship between a friend and frequent partner in real estate deals." 327 F.3d at 1280. Similarly, in *U.S. v. Jiau,* 734 F.3d 147, 153 (2d Cir.2013), a tipper received an invitation to a stock club where members exchanged stock tips. Even though the tipper never actually received or used any tips, access to the club alone was a sufficient benefit to allow conviction. *Id.; see also SEC v. Sargent,* 229 F.3d 68, 77 (1st

Cir.2000) (tipper benefitted by providing inside information to his dentist (and friend) because he "maintain[ed] a useful networking contact," his sister owed tippee money, and he and tippee frequently worked on local chamber of commerce issues); *SEC v. Carroll*, 9 F.Supp.3d 761, 770 (W.D.Ky.2014) ("personal benefit requirement is satisfied" due to "friendship" of tipper and tippee).

■ Thus, a tippee is liable if (1) an insider discloses inside information to (2) a tippee that knows, should know, or consciously avoids the knowledge (3) that the insider breached a fiduciary duty (i.e. received a benefit), and (4) still trades on the inside information. *See Yun*, 327 F.3d at 1269–70 (holding tipper and tippee liable for insider trading); *see also U.S. v. Salman*, 792 F.3d 1087, 1092 (9th Cir.2015) (sustaining insider trading conviction when tipper disclosed information to family member) (Rakoff, J.).

■ Finally, a tippee does not have to receive the information directly from an insider to be held liable. Instead, if they receive the inside information from an intermediate tippee, but otherwise satisfy the elements set forth above, they may be held liable as a "remote tippee." *See Musella*, 678 F.Supp. at 1063 (remote tippees liable because they avoided knowledge regarding original source of information).

The case concerns a remote tippee, Megalli, who knew he was receiving inside information from an intermediate tippee, consciously avoided any additional knowledge about the source of the information, and still traded on the information to the tune of nearly $2.7 million in profits and avoided losses. Megalli pleaded guilty to criminal insider trading under the Securities Exchange. He nonetheless seeks to avoid civil liability in this enforcement action.

The crux of Megalli's argument is that *U.S. v. Newman*, 773 F.3d 438 (2d Cir.

2014), a Second Circuit case that was decided after Megalli's guilty plea, has forever altered the landscape of securities law by imposing a requirement that a tippee who trades on insider information must (1) *actually* know that the original source of the inside information received a (2) "qualifying personal benefit ... [like] cash or other pecuniary consideration[s]" in exchange for the information. (Def.'s MSJ Mem. 3.) He further argues that the pleadings and record show that he did *not* know that Posey, the insider, received a material benefit because Posey in fact received no such benefit. The SEC disagrees, and also argues that Megalli's criminal conviction precludes him from challenging his civil liability anyway.

### A. Issue Preclusion

The first issue before the Court is whether Megalli is precluded from contesting his civil liability after he pleaded guilty to conspiracy to engage in insider trading in his earlier criminal case. The Court holds that he is precluded.

■ A criminal conviction precludes relitigation of the issues decided by that conviction in a later civil action if: (1) the issues presented in both the prior and current action are identical; the issues were (2) actually litigated and (3) critical and necessary to the judgment in the prior action; and (4) the burden of persuasion in the current action is not significantly heavier. *U.S. v. Jean–Baptiste*, 395 F.3d 1190, 1194–95 (11th Cir.2005) (cocaine-distribution conspiracy participant could not contest his alleged lack of knowledge of the criminal nature of his acts in a denaturalization proceeding because scienter was an essential element of the crime for which he was convicted). In addition, the litigant must have had a full and fair opportunity to contest the earlier action. *See Bryant v. Jones*, 575 F.3d 1281, 1303 (11th Cir. 2009). All of these factors are met here.

### 1. Identity of Issues.

First, the issues presented in Megalli's civil and criminal proceedings are identical. In the securities regulation context, courts have regularly held that a criminal conviction for insider trading precludes a defendant from litigating their civil liability for insider trading, because the statutory elements for criminal and civil liability under 15 U.S.C. § 78j(b) and Rule 10b–5 are virtually the same. *See, e.g., In re Bilzerian*, 153 F.3d 1278, 1280–81 (11th Cir.1998) (defendant convicted of securities fraud could not contest SEC action seeking to exempt disgorgement award from bankruptcy discharge); *SEC v. Freeman*, 290 F.Supp.2d 401, 405 (S.D.N.Y.2003) (applying preclusion to a guilty plea to insider trading, because elements required to prove a civil insider trading violation are "essentially the same" as those required to prove a criminal violation); *SEC v. Gordon*, 822 F.Supp.2d 1144, 1157 (N.D.Ok.2011) (applying preclusion in SEC civil enforcement proceeding after defendant was criminally convicted of perpetrating a stock market manipulation scheme); *SEC v. Blackwell*, 477 F.Supp.2d 891, 899–900 (S.D.Oh.2007) (applying issue preclusion in civil enforcement action following insider trading conviction).

Turning to Megalli's case, it is plain that the criminal information he pled guilty to and the civil complaint filed against him concern the same conduct and alleged identical violations of Section 10b and Rule 10b–5's prohibitions against insider trading. The criminal information charged Megalli with conspiring to commit securities fraud by trading on material non-public information, while consciously avoiding knowledge concerning the source of that information, in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5. (Pl.'s MSJ, Ex. 1 at 1, 6.) This conspiracy charge was founded on Megalli's commission of multiple overt acts in 2009 and 2010 of trading in stock based on inside information. (Pl.'s MSJ, Ex. 1 at 6–8; Def's Resp. SMF ¶ 36 (admitting Megalli "traded in February and July 2010 based on actual knowledge of inside information shared by Martin and in October 2009 based on conscious avoidance as to the illicit basis for Martin's sale recommendation")). Megalli pled guilty to these charges.[2]

The civil complaint before the Court concerns the same violations under Section 10(b) and Rule 10b–5, based on the same conduct. (Compl.¶¶ 51–54.) The complaint alleges that Megalli traded shares of Carter's based on material non-public information, that he consciously avoided knowing anything about the source of that information, and that he and the hedge fund that employed him profited from those trades. (Compl.¶ 1.) The complaint identifies the same overt acts identified in the criminal information. (*Compare* Compl. ¶¶ 19–24, 38–43 with Pl.'s MSJ, Ex. 1 at 6–8.) Megalli concedes that in his guilty plea he admitted that he made trades on "the basis of, in whole or in part, certain material, non-public information provided by Eric Martin ... knowing and consciously avoiding the knowledge that the material, non-public information had been obtained by Martin from a Carter's insider in violation of the insider's duties of trust and confidence to Carter's." (Ans., Prelim. Stmt. at 2; *see also* Guilty Plea Transcript at pp. 16:20–25; 17:1–8. 22:12–13.)

This admission concedes all of the essential elements of the SEC's claims,

---

**2.** A guilty plea is as conclusive as to the issues decided as any other criminal conviction, because a plea is an admission of all of the elements of the crime charged. *In re Raiford*, 695 F.2d 521, 523 (11th Cir.1983) (citations omitted).

and demonstrates the identity of issues in the civil and criminal matters. Megalli admits he traded on inside information, knowing or consciously avoiding the knowledge that the inside information came from an insider who had breached his fiduciary duties to his employer. As described above, an insider does not breach their fiduciary duty without receiving a benefit, and a tippee does not violate the law unless they knew or should have known about that breach. By admitting the breach in his guilty plea, Megalli has admitted that the insider (Posey) received a benefit, and that Megalli knew (or should have known) about that benefit.[3] *See Dirks*, 463 U.S. at 660, 103 S.Ct. 3255 (establishing a knows or should have known standard for tippee liability); *Musella*, 678 F.Supp. at 1063 (remote tippees liable when they "did not ask because they did not want to know"); *Santoro*, 647 F.Supp. at 170–71 (*rev'd on other grounds*) ("[a]n allegation that the tippee knew of the tipper's breach necessarily charges that the tippee knew that the tipper was acting for personal gain")). Thus, there is an identity of issues in this case.[4]

## 2. Issues Actually Litigated.

The identical issues found in the civil and criminal actions were actually litigated in Megalli's criminal case. The Eleventh Circuit has held that a defendant may not plead guilty and then claim that the issues decided by their plea were not actually litigated, because a court must find a sufficient factual basis underlying the guilty plea in order to enter judgment against a defendant. *In re Raiford*, 695 F.2d at 523 (applying preclusion to bar discharge of debtor who had been convicted of engaging in fraud in bankruptcy proceedings because guilty plea must have a factual basis to be accepted by the court).

In this case, the facts underlying the criminal action included the allegation—admitted in Megalli's plea—that he consciously avoided knowledge about the insider Posey's identity. This admission satisfies the requirement that Megalli know that he was trading on inside information obtained in exchange for a personal benefit to the insider. *Obus*, 693 F.3d at 288–89 (reversing district court grant of summary judgment for defendant and holding remote tippee liability may be based on conscious avoidance). Because this admission was necessary to Megalli's plea, it was actually litigated. *See In re Raiford*, 695 F.2d at 523.

Megalli contends that at least some issues in this case were not actually litigated because the *Newman* decision introduced new elements essential to support civil and

---

**3.** The Court gives no credence to Megalli's argument that proof of an independent fiduciary duty between the insider Posey and the immediate tippee Martin (as opposed to between the insider and the corporation he owes a duty to) is necessary to support liability here. (Def.'s MSJ Mem. 4.) That is simply not the law. If the elements necessary to support a fiduciary breach by the insider are present, then the breach travels downstream, leaving this argument up a creek. *See Dirks*, 463 U.S. at 660, 103 S.Ct. 3255 ("a tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information ... when the insider has breached his fiduciary duty to the shareholders").

**4.** The SEC also alleges violations of 15 U.S.C. § 77(a)(1)–(3). For the purposes of issue preclusion, violations of these provisions are the same as violations of Section 10b and Rule 10b–5 because they involve fundamentally the same conduct. *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir.1999) (elements of a violation under Section 17 are "essentially the same" as those under Section 10(b) and Rule 10b–5); *SEC v. Haligiannis*, 470 F.Supp.2d 373, 382 (S.D.N.Y.2007) (applying issue preclusion in civil action under Section 17 after defendant pleaded guilty to Section 10(b) violation).

criminal insider trading liability. For the reasons described in Section B below, the Court disagrees. Megalli pleaded guilty in a court bound by Eleventh Circuit authority, and his plea admitted the facts necessary to support an insider trading conviction under Eleventh Circuit law. Even if governing authority in the Second Circuit may have changed, there is no indication at this juncture that it has in the Eleventh Circuit too.[5]

### 3. Full and Fair Opportunity to Litigate.

Megalli had a full and fair opportunity to present his case in the criminal proceeding. The Eleventh Circuit recognized in *In re Raiford* that the seriousness of a criminal prosecution by itself sufficiently incentivizes defendants to contest the proceedings. 695 F.2d at 524. That incentive was certainly present here, where Megalli pleaded guilty to a felony that carried a potential sentence of several years and significant financial penalties (and where he actually served a sentence of roughly one year).

The *Raiford* court also noted that defendants have the option to plead *nolo contendere* if they wish to avoid the effects of preclusion, and their failure to do so means they "cannot argue subsequently that the lack of a contested trial renders his plea ineffective for collateral estoppel purposes." 695 F.2d at 523. In any event, counsel for Megalli stated at his plea hearing that "the Government has been very forthcoming in providing its evidence, and allowing us more than ample opportunity to present factual and legal challenges, and it's been a very fair process." (Guilty Plea Transcript at pp. 30:23–25; 31:1.) Moreover, Megalli was aware, and the Government advised the criminal court, that the *Newman* case was "percolating" in the Second Circuit. (Guilty Plea Transcript at

pp. 13:14–25, 14:1–8.) Nonetheless, Megalli chose to plead guilty.

### 4. The Relative Burdens of Proof.

Finally, with respect the final element of the issue preclusion test, it goes without saying that the burden of persuasion in this civil matter is less than what the government had to prove in Megalli's criminal case. Accordingly, issue preclusion applies to this matter.

### B. The Impact of *Newman*.

Nonetheless, Megalli insists that *Newman* changed the elements of an insider trading violation, so that the underlying facts that he admitted to when pleading guilty in 2013 are no longer sufficient to establish his civil liability. More specifically, Megalli argues that *Newman* now requires that remote tippee defendants have (1) *actual* knowledge of an insider's disclosure of confidential information in exchange for a (2) *pecuniary* personal benefit. (*See* Def.'s MSJ Mem. 3.) In fact, Megalli argues the undisputed facts in both his criminal case and this one show that he is *not* liable under the *Newman* standard for remote tippee liability.

The Court disagrees, for three primary reasons. First, *Newman* is a Second Circuit case, and thus is not controlling on the Court. What is controlling are Eleventh Circuit precedents rejecting Megalli's arguments that *actual* knowledge of an insider's receipt of an *immediately* pecuniary benefit is necessary to hold a remote tippee liable for securities violations. *See, e.g., SEC v. Big Apple Consulting USA, Inc.,* 783 F.3d 786, 804–805 (11th Cir.2015) (requiring conscious avoidance as opposed to actual knowledge); *Yun,* 327 F.3d at 1263 (benefit to insider need not be immediately pecuniary).

Second, the Court is not convinced that, at least as applied to this case, *Newman* is

---

**5.** Nor does Megalli offer the Court any authority for the proposition that a defendant may *now* disclaim the crucial element of his plea tendered, as discussed next.

as radical a change as Megalli suggests. *Newman* recognizes and appears to preserve Second Circuit precedents acknowledging that not all benefits must be immediately pecuniary and that a tippee who consciously avoids knowledge concerning an insider is still liable. *Compare Newman*, 773 F.3d at 455 (insufficient evidence to allow jury to find defendants knew or consciously avoided knowledge that information came from insiders) *with Obus*, 693 F.3d at 288–89 (conscious avoidance sufficient). For these reasons, the Ninth Circuit recently declined to follow or extend *Newman* in the manner Megalli urges this Court to do. *See Salman*, 792 F.3d at 1094 (always requiring a material benefit would mean "a corporate insider ... would be free to disclose that information to her relatives [or friends], and they would be free to trade on it, provided only that she asked for no tangible compensation in return.") *Newman* has made waves, but the Court is not convinced it is a total sea change.

Third, even if the Court were to adopt a more stringent reading of *Newman*, the SEC would still be entitled to summary judgment as to Megalli's liability, for two reasons: one, because the government's case in *Newman* was far weaker than it is here, and two, because the insider in this matter (Posey) did in fact receive at least some benefits in exchange for his disclosure of inside information, as discussed further below.

*Newman's* facts posed significant problems for the government's case with respect to both the knowledge[6] and benefit elements of insider trading liability. The Newman court prefaced its analysis by airing its concerns about "the doctrinal novelty of [the government's] recent insider trading prosecutions, which are increasingly targeted at remote tippees many levels removed from corporate insiders." 773 F.3d at 448.

The *Newman* defendants personified the Second Circuit's concerns. First, they were "three or four" levels removed from the actual insiders, and were receiving the "inside information" filtered through several levels of junior analysts. Those junior analysts testified that they did not actually inform the *Newman* defendants that they were communicating inside (as opposed to public or non-material) information to them. *Id.* at 443–44, 453. Moreover, the kind of information the *Newman* defendants received was of the type that was routinely used by investment professionals. The evidence in *Newman* "established that analysts at hedge funds routinely estimate metrics such as revenue, gross margin, operating margin, and earnings per share through legitimate financial modeling using publicly available information and educated assumptions about industry ... trends." *Id.* at 454. Thus the information that the *Newman* defendants were receiving was "of a nature regularly and accurately predicted by analyst modeling." *Id.* at 455. In short, the *Newman* defendants would have been completely justified in assuming that the information they were receiving was simply the good work of their employees, and not based on inside information whatsoever. *See id.* at 455. Thus the government could not prove beyond a reasonable doubt that the *Newman* defendants knew that they were trading on inside information. *Id.* In essence, the

---

6. The Court declines to endorse Megalli's contention that *actual knowledge* of an insider's identity and the benefit he received, and *only actual knowledge*, is required by *Newman*. As described above, it is not the law in this Circuit; it is not the law in the Second Circuit, *see Obus*, 693 F.3d at 286; it is not the law under *Newman*, 773 F.3d at 438 (indicating that the government might have prevailed if had proven conscious avoidance), and, as far as the Court can tell, it is not the law anywhere.

*Newman* defendants were at the tail end of a game of telephone, receiving distorted-at-best transmissions, so that it was not even clear that they knew they were trading on inside information *at all.* *Id.* at 454.

The *Newman* defendants' ignorance about whether they were receiving inside information was not the government's only problem. The government also "presented absolutely no testimony or any other evidence ... that [Defendants] consciously avoided learning" that they were trading on information obtained from insiders. 773 F.3d at 453. Because there was no testimony or evidence supporting conscious avoidance, no rational jury could find the remote tippees in *Newman* guilty under Second Circuit law. *Id.* at 455.

Finally, the Government also presented extremely weak evidence concerning the alleged benefits to the insiders, which included, for one insider, exactly "[nothing]" of value from a casual acquaintance," and for another, "career advice" like "minor suggestions" on a resume, and advice *prior* to an informational interview that would have been provided even if the insider had not passed along inside information. *Id.* at 453. Just as important, the intermediate tippees in *Newman*—the ones transmitting the alleged inside information to the actual *Newman* defendants—were not even clear whether or not the insiders were receiving any sort of benefit at all. *Id.* If the sources close to the insider could not even determine if the insiders expected a personal benefit, the *Newman* defendants could not be expected to understand the insiders' motives either (if they were even aware that the insiders existed, as noted above). *Id.* at 455.

By contrast, in this case Megalli was only one level removed from the insider, admitted he knew that he was trading on inside information, and admitted he knew or consciously avoided all additional information, including who the inside source was and whether or not that insider was receiving a benefit in exchange for his disclosure. (Def.'s Resp. SMF ¶ 36; Ans., Prelim. Stmnt. at 2.) Megalli's case is thus different from *Newman* in nearly all respects. Megalli knew he was trading on inside information, whereas in *Newman* the government failed to prove even that fact. He admitted consciously avoiding all other information, while the government in *Newman* presented "absolutely no" evidence supporting conscious avoidance. And Posey and Martin, the insider and immediate tippee in this case, were more than just friends—they were friends with (potentially pecuniary) benefits.

In particular, Posey passed along the inside information to Martin for a variety of reasons, including their friendship and because he felt bad for the way Martin had been treated by Carter's, a fact that indicates intent to make a gift of insider trading profits to Martin. (Pl.'s Resp. SMF ¶¶ 6–9; Guilty Plea Transcript at p. 18:20–25) (describing Posey and Martin's "personal and professional" relationship); *see also Salman*, 792 F.3d at 1092. Martin, in turn, passed stock tips to Posey, as well as what was likely inside information about a different company.[7] (Pl.'s Resp. SMF

---

**7.** There are additional facts in this case that are not *genuinely* disputed. Megalli "mostly agree[d] factually with pretty much everything" said by the government at his plea allocution, quibbling only over a few specific and largely minor issues. He raised no dispute about the government's characterization of Posey and Martin's relationship, which the government described as "a personal and professional" one that included travel, golf outings, lunches and other work and social events. Guilty Plea Transcript at p. 18:20–25. The government further alleged that Posey disclosed the information to Martin for "reciprocal stock tips about other public companies ... future network opportunities, friendship and other tangible and intangible

¶¶ 10–11; Guilty Plea Transcript at p. 19:17–19); *see also Jiau*, 734 F.3d at 153 (invitation to stock club was a benefit). These facts put Megalli's case closer to *Salman* and *Jiau* (where convictions were sustained) than *Newman*. To the extent there are gaps about the nature of Posey and Martin's relationship or the extent of the benefits Posey expected to receive, they were supplied by Megalli's conscious avoidance of those facts, and filled by his guilty plea which included, as essential elements of the underlying crime, the existence of a benefit to Posey. *See Yun*, 327 F.3d at 1280 (requiring a benefit).

The *Newman* court recognized that a change in any or all of that case's circumstances would warrant another result. *See* 773 F.3d at 455 (indicating that consciously avoiding knowing that information came from an insider or that the insider received a benefit might have sustained conviction). This different case, with different facts, yields a different result. Summary judgment for the SEC on the question of Megalli's liability is therefore proper and is **GRANTED.**

**C. Remedies Available to the SEC.**

The next issue presented is what remedies the SEC can obtain. The SEC seeks three kinds of relief for Megalli's civil insider trading violations. First, it seeks disgorgement of his ill-gotten gains. Second, it seeks civil penalties. Finally, it seeks injunctive relief.

**1. Disgorgement.**

Turning first to the issue of disgorgement, the SEC seeks an order requiring Megalli to remit the entirety of the profits earned and losses avoided by his employer, Level Global, along with prejudgment interest. This, according to the SEC, totals more than $3,000.000.00. Megalli, for his part, claims his direct personal profits from his insider trading were less than $2,000.00.

▮▮▮ Disgorgement is an equitable remedy intended to deprive a wrongdoer of his ill-gotten gains. *SEC v. Miller*, 744 F.Supp.2d 1325, 1342 (N.D.Ga.2010). As such, disgorgement applies to the extent by which a defendant profited or avoided losses as a result of their wrongdoing. *SEC v. Patel*, 61 F.3d 137, 139–40 (2d Cir.1995) (imposing disgorgement of avoided losses); *SEC v. Smyth*, No. 01–cv–1344–CC, 2006 WL 5440414 at *1 (N.D.Ga. July 28, 2006) (same). Imposing a larger sum would be an improper penalty assessment. *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir.1978).[8] However, district courts have broad discretion to fashion a disgorgement remedy, and the amount of disgorgement need only be a "reasonable approximation" of the profits or losses avoided connected to the violation. Further, the risk of uncertainty in calculating disgorgement falls upon the wrongdoer whose conduct created that uncertainty. *Patel*, 61 F.3d at 139–40.

▮▮ The issue here is whether this Court can impose disgorgement liability upon Megalli to the extent that his employer profited or avoided losses. As the Second Circuit recently observed in *SEC v. Contorinis*, 743 F.3d 296 (2d Cir.2014), "no other circuit has spoken to the precise question of disgorgement liability for an

---

benefits." (Guilty Plea Transcript at p. 19:15–20.) While Megalli now alleges that these facts are (1) disputed because they were not necessary to sustain his plea and (2) not material because they are insufficient to establish liability (Def.'s Resp. SMF ¶ 16), the Court disagrees on both counts. Under *Yun*, they were both necessary and sufficient to support and sustain a conviction. 327 F.3d at 1279–81.

**8.** *Blatt* was decided by the former Fifth Circuit, and is thus binding authority in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981).

insider trader who had trading power but not disbursement control over a financial [institution] whose funds were used to perpetrate the fraud." 743 F.3d at 305 n. 5. The *Contorinis* court held that such disgorgement was appropriate when the violator had substantial control over the trading powers of his firm (a fact that is not clear from the record here). However, the *Contorinis* court noted that the former Fifth Circuit had reached a different result on the related question of whether an individual participating in a securities fraud scheme could be required to disgorge profits beyond the amount of his personal gain. *Id.* at 305 n. 5 (quoting *Blatt*, 583 F.2d at 1336).

In *Blatt*, the court imposed disgorgement, but only to the extent of "the amount of the fee realized by each defendant for his assistance in executing the fraud." 583 F.2d at 1336. Since *Blatt*, district courts in the Eleventh Circuit seem to have been careful in not imposing disgorgement above and beyond a "reasonable approximation" of the direct gain accruing to the wrongdoer. *See e.g., SEC v. Phoenix Telecom, LLC*, 231 F.Supp.2d 1223, 1225–26 (N.D.Ga.2001) (quoting *Blatt* and imposing disgorgement only to extent of wrongdoer's one-third interest in a company). As this Court remains bound by *Blatt*, it thus declines at this time, without further evidence, to order disgorgement of the entirety of Level Global's admitted realized profits and avoided losses.

▮ However, Megalli's contention that he only realized less than $2,000 in profits from his misconduct is also problematic. First, he provides no factual support whatsoever for how he arrived at that figure, merely asserting it in his briefs alongside a handful of context-less calculations. *Compare SEC v. Tourre*, 4

F.Supp.3d 579 (S.D.N.Y.2014) (disgorging 11% of hedge fund trader's bonus after reviewing evidence, including affidavits, concerning the amount of his bonus attributable to his wrongdoing). Thus the Court is unable to determine if the proposed amount is a "reasonable approximation" of the gain that Megalli realized from his violations through his bonus.

Second, Megalli omits any portion of his salary from his proposed disgorgement remedy, despite the fact that the Eleventh Circuit has held that salaries are a proper target for disgorgement. *SEC v. Merchant Capital, LLC*, 486 Fed.Appx. 93, 97 (11th Cir.2012). The Court therefore lacks a sufficient basis to determine what amount of disgorgement is proper in this case, and **DENIES** summary judgment as to both Parties regarding the equitable remedy of disgorgement.

**2. Civil Penalties.**

Because the Court declines to grant summary judgment for the SEC on its request for disgorgement, a determination of civil penalties would be similarly inappropriate. Courts may impose a civil penalty of up to "three times the profit gained or loss avoided as a result of" insider trading. 15 U.S.C. § 78u–1(a)(2). The Court cannot determine the amount of civil penalty without first determining what Megalli gained (or avoided) through his conduct.[9] Summary judgment is therefore **DENIED** as to both Parties on this issue.

**3. Injunctive Relief.**

Finally, the SEC has asked for an injunction against Megalli. The Court is cognizant of the fact that Megalli was sentenced in his criminal case based on his assurances to the court that he was "going to work through a settlement with the SEC that is going to involve permanent

9. The Court assumes, without deciding, that the civil penalty provision permits imposition of a penalty equal to three times the profit

gained or loss avoided *by the defendant* (as opposed to his employer).

debarment from the industry." (Pl.'s MSJ, Ex. 8 at 8.). Nonetheless, the Court defers ruling on the appropriateness of injunctive relief, and the scope of that relief, until the Court has had an opportunity to hear from counsel at the hearing on equitable relief.

## IV. CONCLUSION.

Accordingly, Plaintiff's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART.**

Defendant's Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment is **DENIED.** Defendant's Motion for Oral Argument [Doc. 46] is also **DENIED,** except to the extent that the Court hears such argument at the evidentiary hearing on equitable relief.

The Court will hold an evidentiary hearing as to the issue of disgorgement and the appropriateness of a civil penalty and injunctive relief on October 27, 2015, at 10:30 a.m.

**IT IS SO ORDERED** this 24th day of September, 2015.